Thank you. We'll call the next case, J.S. versus the Blue Mountain School District. And Ms. Roper. Yes, good morning, Your Honor. Good morning, Judge Fischer. Judges, may it please the Court, my name is Mary Katherine Roper. I represent the appellants, J.S. and her parents. And with the Court's permission, I will reserve four minutes for rebuttal. That request will be granted. Thank you.  This is a special case, drawn by the Supreme Court, between in-school and out-of-school speech for purposes of defining school authority to discipline that speech. This dichotomy comes directly from Tinker, the mother-father of all school speech cases, in which the Court said it is the special circumstances of the school environment that cause us to compromise the protections of the First Amendment that otherwise would apply to students as persons under the Constitution. Would you authorize your client's speech as political? I would not, Your Honor. And hasn't the Supreme Court in Frazier carved out an exception to the Tinker doctrine for lewd and vulgar speech? Within the school, yes, Your Honor, it has. And that was specifically noted by Justice Roberts writing in Morse when he said, had Frazier given the same speech outside the school environment, it would have been protected. He cites Cohen. I would cite ACLU v. Reno v. Ashcroft v. Mukasey v. Moore. Regarding Tinker, there is some language in there that talks about conduct by a student in class or out of it. How do you square that with your argument? Because Tinker also talks about students using their speech, using their mouths, whether they're in the class, in the hallways, going to and from class. When you couple that language with the fact that Tinker talks all about the special requirements of the school environment and the need of the school to maintain order and some sort of productivity in the school environment, that is what Tinker means when it says in or out of class. It doesn't mean away from school. It doesn't mean outside of school hours. It doesn't mean at home on a computer on a Sunday night in her parents' house, never bringing the words to school. Your client initially posted her comments so that anybody could access them, correct? That's correct. And then the next day she shut it down so it could only be done by permission, correct? That's correct. And she gave permission to 22 students in the middle school to view the posting, correct? I believe that's right, yes. Wasn't it her intention for her comments to have an effect inside the school by those actions? Isn't that indisputable? What she has testified is that she was making a joke about the principal for the benefit of her friends. Her friends, not surprisingly, are fellow middle school students. So the answer to my question is yes. She wanted her comments to have an effect. You say the effect was humorous. She wanted her comments to have an effect within the school, correct? I don't think there's any testimony by JS that would establish that kind of an intent. Clearly, however, she intended... You just said she wanted her fellow students to share in the humor. They're the only ones who would get the humor. They're the only people who would get the humor because they're in the school, correct? And, Your Honor... So she wanted the comments to have an effect within the school, correct? If you're equating communicating with school students with having an effect in school, then absolutely you're right. And she accused, you say tongue-in-cheek, she accused this principal of criminal conduct. Did she not? She absolutely, in joking, made many comments that portrayed this principal as a sex addict and a pedophile, not to mention all kinds of other things. Is that really something you can possibly joke about? It certainly is. People joke about it all the time. Wasn't this an intent to embarrass or belittle the principal? What it was, Your Honor, was an intent, was an attempt to make a joke. All of which, and it doesn't matter actually whether she was intending to embarrass the principal, whether she liked him or disliked him, whether she only wanted to make people laugh or also wanted to get off some grudge against him. All of this is speech that she engaged in from her home that is not in any way... If we were to follow the Second Circuit analysis and determine that in this age, and I understand that her posting was not accessible on school computers, but in this age where information is so extremely fluid and so easily transmitted that off-campus conduct that is intended to have a disruptive effect on campus does not get judged by the Tinker Standard, but gets judged by the Moore Standard, what would be wrong with that? Your Honor, I don't think that you've correctly stated the Second Circuit Standard. The Second Circuit Standard is that when there is satisfaction of the Tinker Standard, that is when the Substantial Material Disruption Standard is satisfied, and I will admit to you the Second Circuit formulates that very differently than the Third Circuit. When you have that and you have a foreseeability that comments about school officials are going to reach the school, then the school has the same authority to discipline as it would if the comments had been made at school. Now that rule would still, while we will argue that that should not be applied, but we don't think it's a correct statement of the law. But even if that rule were applied in this case, JS could not be disciplined because the Tinker Standard, at least as applied by this Court in Sachs, in Sitniewski, et cetera, was not remotely satisfied. There was no disruption. Even the District Court could not find disruption under the Tinker Standard as a result. But under the Frazier Standard, there's no necessity for disruption. That's correct, Your Honor, but no court apart from this District Court has applied Frazier in the absence of satisfaction of the Tinker Standard. The Second Circuit specifically, in Donninger, said we are not going to decide whether we could apply Frazier in the absence of Tinker Substantial Material Disruption. We have, I'm reading from Donninger, we have determined, however, that a student may be disciplined for expressive conduct, even conduct occurring off school grounds, when this conduct would foreseeably create a risk of substantial disruption within the school environment, at least when it was similarly foreseeable that the off-campus expression might also reach campus. Isn't that exactly this case? It is not, Your Honor. She let 22 of her buddies see it. They were all students. It wasn't reasonably foreseeable. Your Honor, the predicate to the Donninger decision is that Tinker is satisfying. Yes, but it wasn't vulgar and lewd speech. It absolutely was vulgar and lewd speech in Donninger. The Second Circuit specifically has a discussion, will we apply Frazier? And the Second Circuit says, we will not make a ruling that we're going to apply Frazier in the absence of the Tinker factors being satisfied. Instead, we're following Wisniewski. We are applying Tinker. We think Tinker is satisfied here because in the Second Circuit, this risk of future disruption is defined very vaguely. In this circuit, it is not. If this circuit were to adopt the Second Circuit decision about what makes it on-campus speech, it still would be a very different outcome than we saw in Wisniewski because in this circuit, under Sipniewski, under Sachs, it requires more than an undifferentiated prediction that there's going to be disruption. Under Sipniewski, the court would have had to find actual factual evidence suggesting that there was going to be substantial immaterial disruption. And when this speech had been out there for three days and the only disruption that the principal could identify was six or seven minutes of students talking during a non-instructional period of class... Were your client's comments defamatory? No, Your Honor, they were not. She called the principal a pedophile. You just said a sex addict. Said he was hitting on his students. For it to be defamatory, Your Honor, it would have to be a statement of fact that would be taken as a serious assertion under both the United States Supreme Court law and Pennsylvania state law, parody what is clearly not to be taken seriously. What was she parodying? She said she was parodying him. She was also parodying a MySpace profile. Isn't it a reasonable person test what a reasonable person would conclude from reading that? Absolutely. And if you recognize the photograph, the students who knew the principal who were directed to the MySpace page, isn't there some reason to believe that they may have believed what was posted about the principal? No, Your Honor. Why not? Because when you look at the profile as a whole, it is quite clearly a joke. It is supposed to be a person speaking about himself. No one would say those things about himself. No one took this seriously, including the school official who's charged with investigating any allegations. As law enforcement would tell you, there are plenty of sites across the globe that one can access that people do, in fact, tell those things about themselves, and in order to try to attract other people of like thinking. This person identified himself as a dick face and talked about his hobbies as being, I'm sorry, a jerk and so on. I mean, this is clearly, this purports to be, it presents as a principal's statement about himself and the way he runs his school. No one did or could take this seriously. And the law of both Pennsylvania and the United States Supreme Court is that when you have a statement that is very clearly tongue-in-cheek, whether or not you agree it's funny, I mean, the eighth graders thought it was funny, but it's juvenile. They would think it was funny. Whether or not you agree that it's funny, it's clearly not meant to be taken seriously. It is not presented as a serious self-presentation by M. Ho. Can I ask, what is, just in a more general view, what rule would you have us apply here? I mean, obviously there are going to be cases like this in the future. I thought perhaps you were arguing a real bright-line test. If it's off campus, the school cases don't apply at all. But I take it that's not what you're saying now. It is exactly what I'm saying, Your Honor. We believe that Tinker makes a clear distinction. When it's on campus, there are special compromised rules about the First Amendment. When it's off campus, the student's rights as a person under the First Amendment apply. It is strict scrutiny for any content-based distinction. But what about actions or speech outside the school that might reasonably be viewed as having a negative impact in school? That's still... That's right. It's off campus, and that's it? It's off campus. And that, by the way, is not only First Amendment law, but just to segue for just a moment into our state law claim, that's very clearly the state law. When the state says even criminal conduct that you could say related to the school in terms of someone smoking pot on school grounds outside of school hours when he stayed late after a school dance, that could not be punished by the school. Under Pennsylvania law, the school district's authority to punish school outside the control... I'm sorry, conduct outside the control of the school simply doesn't exist. But back to the First Amendment, this is why Tinker makes a distinction, and Morse reiterates that distinction between what happens in school and what happens out of school. Because of the special circumstances of the school environment, we change the First Amendment law when students walk through the schoolhouse gate. But when they walk back out of that schoolhouse gate, they get their full rights as persons under the Constitution back. That is when they are under the supervision of the state in terms of civil and criminal laws if someone wants to bring a charge of defamation or harassment or something, which did not happen in this case, and they're under the supervision of their parents. Because like the students, when students walk through a schoolhouse gate, parents give up a certain measure of their control over those students. But when the students walk back out, they belong again to their parents. Well, you concur. Do you agree that the Supreme Court has not decided a Frazier-type case involving off-campus conduct? I agree the Supreme Court has not been presented with that scenario, but Justice Roberts said very clearly in these words, had Frazier given the same speech off-campus, it would have been protected. And I'll add in parentheses, to the same degree as an adult, and the only reason I add that is because he then cites Cohen v. California. So we believe the Supreme Court has addressed this quite directly, although it hasn't been presented with these facts. All right, Ms. Roper, we'll have you back on rebuttal. Thank you. Thank you. Mr. Riva. May it please the Court. My name is John Riva. I represent the Appellee Blue Mountain School District. Your Honors, we are here to argue that the decision, although the decision of Judge Munley should be upheld, with regards to the standard applied in this case, we believe that the decision of Judge Munley is a combination of the Frazier Supreme Court standard and the J.S. v. Bethlehem State Supreme Court decision. How do you get around Chief Justice Roberts' statement in Morse? Your Honor, the statement in Morse with regards to Frazier was about the incident of Frazier was a student giving a speech to basically a group of students. So in essence, he was speaking to other students. The key distinction in this case is that it's about a school administrator, and that's why I say it's a nexus between the Frazier decision and the J.S. v. Bethlehem case, the State Supreme Court decision, because it talks about lewd, the Frazier talks about lewd, vulgar, and offensive speech, which they admit is present in the depiction of Defendant McGonigal, and which, by the way, the Sachs Court, this Court, said is categorically prohibited in school. And the J.S. case, which talks about the effect off-campus speech has on campus. So what you have in this case is, granted, it was speech created off-campus at the student's home, but the effect of it had a direct impact on the functioning of the school. So Judge Munley has created basically a rule that combines the two standards we believe is an appropriate standard to deal with this situation, because in essence... Mr. Rebo, what if the lewd portion of the speech were not present? What if she said he's a lousy principal, he's an idiot, the citizens of this county aren't getting their money's worth paying this guy, he's stealing their money because he's so ineffective, and none of the students should respect his authority because he's a dope? It is not our position, Your Honor, that a student cannot criticize, and that's what your hypothetical entails. A student is free to criticize their principal. I think it crosses the line, Your Honor, when you have this type of profile, and we don't need to go into the details of it, it's all in the appendix, but that's why this rule Judge Munley created is so effective, because it deals with the essence of what Frazier talked about, the role of schools in educating the youth, talking about civilized, preparing students for civil discussion, rationale, talk, and so forth. Is the humor part of that training? Well, sure. Your opponent says this was humorous. Well, I think that's a little self-serving that their contention that this is parody. I think the record reflects that she, in fact, made this shortly thereafter she was written up for address code violation. She was mad at him, and she later said at her TRO hearing that she basically just wrote down everything she heard her friend say. So, I mean, the issue of humor didn't really become involved until the lawyers became attached to this case. Then all of a sudden it became a parody, something that's funny and everyone likes to laugh about. But I think the heart of the matter is, Your Honor, is that it was meant to harm the principal. It was meant to degrade him. It was meant to make him feel less of a person. And quite frankly, this could have affected his career. We can all open up the papers and turn on the television and see all these salacious and horrible allegations of teachers having sex with students. And actually, the Pennsylvania school code has mandates about immorality, and he could have easily been fired. Thankfully, the student in this case admitted to her wrongdoing and voluntarily took down the profile. But what if she didn't? Someone would have to have investigated it. It would have been his word against whoever's. And maybe it isn't. Mr. Ripper talked about it being totally out there. No one would believe it was true. At the very least, it creates an impression that this man is unstable. Why would someone do this? Again, they came onto the school district's website and just took this picture and put it up there. Nonetheless, we are talking about a content-based action. And, you know, we use the strictest scrutiny to evaluate these things. Right. There's other— Mr. Ripper, how do you square this case with the Second Circuit's approach in Doniger v. Niehoff? Well— It was, you know, it was Frazier-type speech. But didn't the Second Circuit do a tinker analysis? I believe, Your Honor, if you look at the actual wording of Doniger, and I believe it's contained in our brief, they indicate that Frazier could apply, but they're going to go with Wisniewski. They didn't decide to go into Frazier. They decided to go along with the previous decision in Wisniewski, which applied tinker. But they said, basically, we're going to leave that for another day. It's quite possible it could go that route. Would you agree that on this—on the record that we have, that there was not disruption? I would agree that there was not— Not tinkered disruption. There was not substantial disruption. I would agree with you on that, Your Honor. But I would argue that given the immediate nature—this profile was created on a Sunday. Immediate buzz began Monday. All these students started talking about Monday or Tuesday. The principal took action Wednesday. I would submit to you, and Tinker actually talks about it, that it needs to just be reasonably foreseeable. Given the immediate nature of everything, it's our contention that if tinker does apply, if Your Honors do apply tinker, that even under tinker, we prevail. Also, under tinker, they talked about— I'm sorry. I missed that. How do you prevail under tinker when you just said there was no substantial disruption? Well, because we believe it's reasonably foreseeable. Foreseeability is an element of tinker. And given the immediate nature of the buzz in the school, of all the students talking about it— It's not just the corrective action that took place so quickly, the disruption didn't have a chance to occur. Exactly. Exactly. And also, Tinker talks about the invasion of rights, that First Amendment does not apply if an individual invades the right of another. Again, and we talked about this in our brief, this profile is an invasion of Mr. McGonigal's rights. Think about, for instance, if this was held constitutional. Students would be free to basically take up any teacher, print whatever they want, and say, well, it's parody. And that creates huge problems for school districts. Because you're going to be constantly spending your time sub-educating students. You're going to be trying to defend baseless parodies and allegations contained over the Internet, which, contrary to the regular hand bill or photocopy, is available to the entire community, the whole world, actually. Yes, but isn't the flip side of that also a risk? Do we want the school districts to all of a sudden become the Internet police for all their students? No. I mean, this was—you said no. No, we don't want to be Internet police. We want— Where do you draw the line? Well, we want a— Principal teacher? We want a properly functioning school. I mean, is it principal teacher? Is that where you draw the line? I would say school administrators, Your Honor. All right, now, but there was a case that actually didn't amount to a case, but it was certainly a controversy in the western part of the state last year. There was a top ten list. It was a handwritten list that was passed around the school. Suppose that was on the Internet. Suppose that was on MySpace or Facebook or on somebody's blog, and it was a communication among students about other students. Should the fact that students were communicating with other students, not about teachers, not about administrators, but about other students, allow the school district to go in and suspend the student who created it? Well, I think that goes to another area of lawmaking. I know that's not this case, but it's a question of where we're going. Right, right. I think with regards to especially this case, I think definitely teachers and administrators should apply. With regards to how it applies to students, I mean, I think that goes into cyberbullying. I know schools have an issue with it. Parents constantly complain to districts about, they want them to take action because they feel their child is being picked on and that at some point the district has to take some action because they're aware of it. So, I mean, how far it extends, I'm not here advocating it extends to students. I'm here advocating that with regards to Principal McGonigal and other school administrators, it definitely extends to them. And again, Tinker dealt with political speech. In this case, there's no political element to this. It doesn't even have, it doesn't add anything to the society's conversation or anything about Principal McGonigal. And again, we talk about this in our brief as well, that we believe this is defamation. Defamation is defined under Pennsylvania law as a statement that harms the reputation of another as to lower him in the estimation of the community or to deter third parties associating or dealing with him. With regards to a parody, if an attempted parody fails to make clear to readers that it's not conveying actual facts, it may be defamatory. Again, we submit that we take this as a whole. It invades Mr. McGonigal's rights, defames him, and for that reason there should not be First Amendment protection afforded to the plaintiff in this case. Now, with regards to some of the other claims, the Snyder's parental rights claims, it's our position that this is on-campus speech. Therefore, the policies articulated by the district have full effect. We talk about in our brief that the policies are clear, false accusations of staff members. That is not vague. That is not over-broad. That's specifically listed in the handbook, and there's associated penalty with it. So with regards to the over-broad or vagueness doctrine, we believe those arguments are without merit. Mr. Arriba, I want to back you up a step. Sure. I don't know if you're familiar with the facts of this case, but are you familiar with the facts of Layshock v. Hermitage? Yes, I am, Your Honor. Okay, and that case, which was in the Western District, granted summary judgment to Layshock, the student, on the First Amendment claim. Can you factually distinguish this case from Layshock? Well, Layshock, they both involve the misappropriation of a school picture. Correct. I know that. With regards to some of the other elements of Layshock, I'm not quite sure as to. I know they're very similar, but I can't really distinguish between some of the actual elements of them. Does it matter to you what is said as to whether it's called Frazier or non-Frazier language? Does your argument turn on whether it's Frazier-like or non-Frazier-like language? I think it's easier when it's Frazier-like language because it's clear. The rule is clear. Both in the Third Circuit and the Supreme Court, lewd, offensive, and profane language is not permitted, and that's the facts of this case. Whether it applies to the Layshock case, I respect that. I'm not asking you that question. I submit it's for that panel to decide, but in this case, I think it definitely applies. Any other questions? If not, we thank you, Mr. Reba. Then we'll have Ms. Roper back on rebuttal. Thank you, Your Honor. I must apologize. First of all, I meant to mention that this is the second case of first impression on this issue in this circuit. The Layshock case was, in fact, argued to another panel of this court in December. Did you argue that? I did not. My colleague, Vic Volchak, who is here, argued that one. Who's on your brief? Yes. Okay. The primary argument here from the school district is that we can create a new rule making off-campus speech on-campus speech when it's about a school official. First of all, this is obviously a content-based distinction and invites viewpoint discrimination because it's pretty clear no school official is going to object to anything nice that a student says off-campus about him or her. But secondly, it flies in the face of everything we know about the First Amendment and about defamation law under which public officials are supposed to be more thick-skinned and less entitled to our protection. A junior high school principal is a public official, a public figure, I think is what you mean. I do not, Your Honor. The requirements, the special heightened requirements for defamation apply to both public officials and public figures. I would not argue Mr. McConnell is a public official, but he certainly is a public figure. I'm sorry, did you just get that backwards? I did get that backwards. He's a public official. He's not a public figure. In fact, even if you go into the cases about the use of profanity against police officers, what the courts say over and over again is you're a public servant. You encounter the public. You need to be a little thick-skinned. And frankly, Mr. McGonigal agrees. He tells us in his deposition, and it's page 8357 of the record, as a principal, you don't make it until you get your name on the bathroom wall. I'm used to that. So there can be no special rule that students, unlike for any other period in time that we've known about, are suddenly no longer allowed to insult their principals and teachers when they are off of school grounds. That would be an extraordinary ruling and an extraordinary change in the practice. This is what students do. Ms. Roper, if we determine that a reasonable person would not have found her client's posting to be a parody, this is then defamatory, correct? And has no First Amendment protection, correct? Well, that is not correct, Your Honor. Defamatory speech is still protected by the First Amendment. It's just less protected by the First Amendment. And that's why we have all these rules about when states can and cannot permit recovery for defamatory speech. However, if there were a finding that this met all of the elements of defamation, I would agree that it then satisfies the Tinker standard of being contrary to the rights of others. I would still argue, however, that the school has no authority to punish that under Tinker, because Tinker is still about within the school environment versus without the school environment, nor does the school have any authority under Pennsylvania school law, which makes it clear that even illegal conduct outside the control and supervision of the school cannot be punished by Blue Mountain. Well, that's – look, arguing that statute assumes that controlling what students say about principals on the Internet is not subject to school control. It is when the student is not under school control, but all of the cases – I don't think the Pennsylvania Supreme Court has decided quite that issue yet, have they? No, but every lower court decision and Pennsylvania appellate court decision regarding that suggests that when students are not under the parents' patriarchal control of the school, they are not under the disciplinary control of the school. Just very quickly, on the issue of Tinker, I would refer you to Tinker itself at page 517, which is the dissent of Justice Breyer when he talks about how much students were talking about these armbands. And the majority held that was not substantial material disruption. That was not enough to breach the First Amendment rights of the students. Finally, I just – I see my time is up. If I could just reiterate that we have four claims. They are not all derivative. The parents' rights claim and the state law claim are independent of the First Amendment claim. The overbreadth claim is perhaps derivative. The district court went beyond any published decision in affirming this discipline. We would urge this court not to take it. Thank you. All right, thank you, Ms. Roper. Thank you, Ms. Roper. And we thank both counsels for an excellent job. And we will take the matter under advisory.